**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**Case No. 0:14-cv-61253**

EVOTER, INC., a Florida Corporation,

      Plaintiff,

   v.

ELECTION SYSTEMS & SOFTWARE, LLC,
a Foreign Limited Liability Company, and
MICHAEL RIDDELL, an Individual,

      Defendants.

_____

**MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS**
**ELECTION SYSTEMS & SOFTWARE, LLC AND MICHAEL RIDDELL**

Pursuant to Fed. R. Civ. P. 56, Defendants Election Systems & Software, LLC ("ES&S") and Michael Riddell ("Riddell") hereby respectfully move the Court for an order entering summary judgment against Plaintiff eVoter, Inc. ("eVoter") on all Counts of the Complaint, for the reasons that there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law. In support of this Motion, Defendants state the following:

## I.     INTRODUCTION

eVoter once had a website, eVoter.com, which provided voters with otherwise public information about elections and candidates through an "interactive user interface design[]." (DE 1-2, ¶9). Riddell had been employed with eVoter because of his marketing experience and capability to create the look and feel of a website. Another eVoter employee, Andy Hawkins ("Hawkins") was the computer programmer who created the website and knew how to make it work.

But eVoter floundered. In 2012, eVoter was crushed under the weight of its failure to generate revenue or inspire interest among candidates, and its inability to pay its employees such

as Riddell and Hawkins. ES&S had conceptual discussions with eVoter in the Spring of 2012, but it became clear eVoter was out of money. The preliminary conceptual discussions with eVoter ended up going nowhere. Ultimately, more than a year later, and more than a year after eVoter failed, Riddell came to work for ES&S as an independent contractor on a separate and distinct project, but which project also failed to yield a working product. Hawkins did not come to work for ES&S at any time. And, in the recent words of eVoter's Rule 30(b)(6) witness, "as we are sitting here in 2015, although other companies are still trying it, [] there is no national go-to voter election site." (SOF ¶32).

Consequently, summary judgment in favor of ES&S and Riddell on all six Counts in the Complaint is a straightforward proposition. eVoter, by its own admission, is missing essential elements for all six of the Counts identified in the Complaint. Its trade secrets claims (Counts III, IV and V) are missing trade secrets. *See* Section III. A., *infra*. Its contract claims (Counts I and II) are missing an enforceable contract. *See* Section III. B., *infra*. Its tortious interference claim (Count VI) is missing both a legitimate expectancy and any "interference." *See* Section III. C., *infra*. All of eVoter's claims are missing damages because eVoter, a speculative and incomplete business model by its own admission, suffered no damages and had no income, therefore it can prove no damages. *See* Section III. D., *infra*.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS AND LEGAL STANDARD

Pursuant to LR § 56.1, ES&S and Riddell have separately filed their statement of undisputed material facts in support of their motion for summary judgment to this brief. This Statement of Facts shall be cited/referred to as "SOF ¶____" for ease of reference. ES&S and Riddell invoke the legal principles applicable to motions for summary judgment and Fed. R. Civ. P. 56.

### III.    ARGUMENT

#### A.    Trade Secrets

##### 1.    eVoter has failed to identify any "trade secrets"

eVoter is missing the most crucial element in any claim that requires a trade secret: to wit, an identifiable, protectable, or protected trade secret. As a threshold matter, it is eVoter's burden to identify, specifically, what are its "trade secrets" at issue in this case. *See Revello Med. Mgmt., Inc. v. Med-Data Infotech USA, Inc.*, 50 So. 3d 678, 679-80 (Fla. Dist. Ct. App. 2010) ("The plaintiff must, as a threshold matter, establish that the trade secret exists. To do so, it must disclose the information at issue.") (citation omitted). On top of this burden, eVoter must also describe its "trade secrets" with "reasonable particularity." *See Del Monte Fresh Produce Co. v. Dole Food Co. Inc.*, 148 F. Supp. 2d 1322, 1325 (S.D. Fla. 2001) ("Del Monte must describe with reasonable particularity the trade secrets at issue in this case."). There is a common sense virtue to these fundamental legal requirements: if the information truly is a "trade secret"— meaning it derives value from not being generally known and there have been efforts to maintain its secrecy—then it should not be difficult for eVoter to articulate precisely what its "trade secrets" are. *Id.* at 1324 (bringing a claim under the UTSA waives any privilege in claiming information as a trade secret by placing the trade secrets at issue). Failure to specifically identify any trade secret provides a basis for granting summary judgment on claims that require the existence of a trade secret.

For instance, in *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330 (M.D. Fla. 2006), the court granted summary judgment in favor of all defendants who had been accused of misappropriating the plaintiff's trade secrets, among other things, because the plaintiff failed to identify any actual trade secrets. *See id.* at 1338-39. The plaintiffs in *Border Collie Rescue*

"speculate[d]", without any supporting evidence, that because there was a proposal contained on one defendant's laptop, and that one defendant had met with the other defendants, that the plaintiff's proposal must have been transmitted to all the defendants. *Id.* But for the court, such "conclusory allegations amount to nothing more than rank speculation, and are the type of conjecture which is insufficient to withstand a motion for summary judgment." *Id.* (citation omitted).

This case is just like *Border Collie Rescue*, making summary judgment appropriate here too. For example, when asked what specific "trade secrets" were at issue, eVoter's 30(b)(6) witness testified that "the mistakes we made" and the "lessons we learned" were eVoter's trade secrets. (SOF ¶34). eVoter also claims that trade secrets of the company are "the entire knowledge that we built up in building this platform … [h]ow to accomplish the goal was the trade secrets of the company." (*Id.*).  However, generic business platitudes are not trade secrets.

"In order to ascertain whether trade secrets exist, the information at issue must be disclosed." *Lovell Farms, Inc. v. Levy*, 641 So. 2d 103, 104-05 (Fla. Dist. Ct. App. 1994). eVoter has not identified any trade secrets or anything other than "rank speculation." Just because Riddell attended a meeting in January 2013 does not mean that anyone disclosed or misappropriated anything. Indeed, what eVoter wishes to point to is a meeting agenda in January 2013 alluding to "lessons learned" or "mistakes made" by eVoter. But Riddell only spoke for about 10 minutes regarding the importance of search engine optimization and the importance of having an integrated online marketing and branding strategy. Furthermore, he does not recall Hawkins discussing anything at all regarding eVoter in the meeting. (SOF ¶24). These are not trade secrets.

Moreover, the "lessons learned," if any, and the "mistakes made," no matter how many, cannot legitimately be called "trade secrets," any more than claiming the "entire knowledge" that was built up or "how to accomplish the goal" is a trade secret. *See Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1287 (S.D. Fla. 2007) (description of purported trade secrets was "extremely vague" where alleged secret was "knowledge about the best type of plastic to be used in making the disks, the best type of mold to be used in making the disks, a special way that the plastic is delivered into the mold, the identities of the best suppliers for various materials in the industry, and perhaps other measurements"). eVoter's description of its trade secrets is equally vague, if not more vague, than the descriptions found lacking in *Border Collie Rescue* and *Levenger* and therefore its trade secret claims fail as a matter of law.

2.   **The manner in which eVoter compiled public information and published it on the World Wide Web is not a "trade secret."**

a. *Compiling public information does not transform the information into a trade secret*

eVoter was unable to articulate a specific trade secret relying instead on the mere "lessons learned" and "mistakes that were made" during its 30(b)(6) deposition. Instead, eVoter described how it "built a platform" and "accomplished a goal." (SOF ¶34). What became clear from its description, however, is that neither the "platform" nor "the goal" are trade secrets either. Rather, they are merely a collection of otherwise publicly available information, that is readily accessible as a matter of law.

To qualify as a trade secret, the information that the plaintiff seeks to protect must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy. *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1360 (S.D. Fla. 2012) (quoting *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001)). If the information in question is generally known or readily

accessible to third parties, it cannot qualify for trade secret protection. *Id.  See also Del Monte Fresh Produce Co.,* 136 F. Supp. 2d 1271, 1291(S.D. Fla. 2001).  Further, "[t]he party claiming trade secret protection has the burden to show how the information qualifies as a trade secret." *Id*. (citing *Sw. Stainless, LP v. Sappington*, 582 F. 3d 1176, 1190 (10th Cir. 2009)).

Where a compilation is composed of public information, which inherently is always readily ascertainable by proper means, Florida courts hold that no trade secret exists. For example, in *Templeton v. Creative Loafing Tampa, Inc*., 552 So. 2d 288 (Fla. Dist. Ct. App. 1989), the court held that a customer list that was derived from information that was available from looking at past issues of several newspapers, magazines, and yellow pages was not a trade secret because it was available from public sources. *Id.* at 290. Likewise, in *Health Care Mgmt. Consulting, Inc. v. McCombes*, 661 So. 2d 1223 (Fla. Dist. Ct. App. 1995), the court held that a consultant's expertise in interpreting Medicare regulations was not a trade secret because "it principally involves the interpretation of public Medicare regulations and, as such, is 'readily ascertainable by proper means' through researching the Code of Federal Regulations." *Id.* at 1226. *See also Pub. Sys., Inc. v. Towry*, 587 So. 2d 969, 971 (Ala. 1991) (holding spreadsheet data program not trade secret because data compiled from government information was generally available to public) (cited with approval by *Health Care Mgmt. Consulting, Inc.*, *supra*).

In this case, eVoter explained that what eVoter compiled was information about the addresses of polling places and the candidates running for office. (SOF ¶42). eVoter explained that its website displayed election dates, ballot and candidate information, and candidate endorsement information that organizations provided to eVoter. (SOF ¶43). eVoter then admitted this basic election information is public information. (SOF ¶35). ("Ballot information and who the candidates are is publicly available, because obviously the counties have to give you the

information, even if they charge you for it, it's public information, it's their duty as a governmental entity.") (SOF ¶36). For reasons obvious to courts, and to eVoter in moments of candor, what eVoter did was compile public information, readily obtainable from other sources—some of whom were under "the duty" to make it publicly available. That, as a matter of law, is not a trade secret and therefore summary judgment is proper.

     b. ***Publishing public information and the "user experience" with the published information proves the information is not a trade secret.***

Over and over in its deposition, eVoter touted that its "user experience" and how it put public information back out into the public domain on its website for the user to experience were part of its "trade secrets." Courts confronted with claims identical to those eVoter makes in this case have historically granted summary judgment in favor of defendants because those courts recognize that the "user experience" and how the user experience was created are too ephemeral as concepts to qualify as trade secrets.

Even more obvious to the courts and defendants, if not to plaintiffs, is that the "user experience" is part of what keeps public information public because the public is viewing and using the information. "If the information is necessarily disclosed upon use by a third party, the information cannot qualify as a trade secret." *In re Maxxim Med. Grp., Inc.*, 434 B.R. 660, 690 (Bankr. M.D. Fla. 2010). Likewise, how a user of public information obtains the information is not a trade secret.

For example, in *Sigma-Aldrich Corp. v. Vikin*, 451 S.W.3d 767 (Mo. Ct. App. 2014), the court was confronted with a plaintiff that claimed trade secret status for the "user experience" on its website, Sigma-Aldrich.com. *Id.* at 774. The court explained that Sigma's claims that the "legwork" performed to make the website go live resulted in "publication" of the ideas as the

user experience. *Id.* at 774-75. As such, the court concluded, "the items Sigma wishes to protect are not trade secrets." *Id.* at 774.

Similarly and recently, in *Warehouse Sols., Inc. v. Integrated Logistics, LLC*, 610 F. App'x 881 (11th Cir. 2015), the Eleventh Circuit affirmed summary judgment in favor of a defendant on a trade secrets claim where the court concluded that "look and feel" and "functionality" of a computer program were not a trade secrets. *Id.* at 884-85. In *Warehouse Sols.*, the court noted that the district court properly "drew a distinction between a software program's underlying source code, which may be a trade secret, and the program's 'look and feel' and 'functionality,' which cannot." *Id.* In affirming summary judgment in favor of Integrated Logistics, the Eleventh Circuit reasoned that "unlike source code, which is written in a programming language and is not accessible to program users, a user of Intelligent Audit can readily ascertain the appearance and functionality of the system and, thus, the visible output cannot be a trade secret." *Id.* That is no different than what eVoter has put at issue here. *See* (SOF ¶41) (stating that how we make [the website] a user-friendly experience" is information "at issue" in this case).

But in this case, eVoter also admitted that "how our website worked was on the Internet." (SOF ¶37). Of course, eVoter then had to admit that "[s]o how the website worked, you know, from a user interface or what it did or where it was going, that was very much public knowledge."). (*Id.*). ("We had two million users that knew how the website worked."). (*Id.*). The fact that eVoter trumpets that two million people know how its website works precludes eVoter from claiming now that how its website works is a trade secret.

Another critical admission that is fatal to eVoter's trade secrets claims is that eVoter attributes the expertise in developing user interface of the website to Michael Riddell, and the experience he brought from elsewhere to eVoter:

> Mike was all about the user interface, okay, he was all about how voters came to the site, how candidates came to the site, how they interacted with the platform, how they knew to do what we needed to get them to do, how they experienced that whole thing.

(SOF ¶ 39). eVoter cannot seek to protect Riddell's expertise as a trade secret.

eVoter's insistence that what Riddell knows about how to compile information to market on a website or present an election website is not a trade secret either. *See* (SOF ¶¶ 38, 40). Plaintiffs, including eVoter, cannot preclude defendants, including ES&S and Riddell "from using the know-how and experience they learned while employed by a previous employer . . . ." *See Eli Research, LLC v. Must Have Info Inc.*, 2015 WL 5895460, *7 (M.D. Fla. Oct. 6, 2015) (citing *RLM Communications,* 66 F. Supp. 3d 681, 696 (E.D.N.C. 2014) and *Engineering Associates, Inc. v. Pankow,* 268 N.C. 137, 139, 150 S.E.2d 56 (1966) (holding "where a person in his new employment undertakes to use the knowledge acquired in the old, it is not unlawful, for equity has no power to compel a man who changes employers to wipe clean the slate of his memory.").

Similarly, on a motion for a preliminary injunction, another Florida court found that "[an] argument that the knowledge [former employee] possesses is confidential and constitutes trade secrets, disclosure of which would potentially violate FUTSA, is unpersuasive." *See WellCare Health Plans, Inc. v. Preitauer,* 2012 WL 1987877, *2 (M.D. Fla. May 23, 2012) *report and recommendation adopted*, 2012 WL 1987692 (M.D. Fla. June 4, 2012). *See also Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) ("The law of trade secrets will not protect talent or expertise, only secret information.") (citation

omitted); *W. Med. Consultants, Inc. v. Johnson*, 835 F. Supp. 554, 558 (D. Or. 1993) aff'd, 80 F.3d 1331 (9th Cir. 1996) ("Any knowledge defendant may have in [marketing techniques] is general information, knowledge and expertise gained through the ordinary course of her employment by plaintiff.").

Any related and additional "expertise" Riddell may have gained as an eVoter employee is also not a trade secret. *See Hogan Sys., Inc. v. Cybresource Int'l, Inc.*, 158 F. 3d 319, 325 (5th Cir. 1998) (affirming summary judgment and holding that expertise gained by defendants during their employment with plaintiff was not protected as trade secret where other individuals in field would obtain comparable abilities and expertise); *Victoria's Secret Stores, Inc. v. May Dept. Stores Co.*, 157 S.W. 3d 256, 262 (Mo. App. E.D. 2004) ("The [trade secret] protection does not extend to knowledge that is the natural product of the employment or known throughout the industry....").

Likewise, eVoter admitted that:

> [J]ust the know-how and building the site, how to market the site, how to develop the site, how to prevent -- how to present it to the voters, and the term GUY in there, is like user interface, so that users would actually know what to do on the site, which was a huge issue for us and is an area of Michael's expertise . . . .

(SOF ¶38). As a a matter of law, Riddell's expertise is not a trade secret; rather, it is Riddell's to use as a matter of right.

Notable also is that eVoter admitted Google had developed a similar product to eVoter by the general election of 2012. (SOF ¶33).

### 3.   eVoter does not protect its computer code.

According to eVoter's designated witness, "the entire website is sitting in, I assume, sitting in Andy Hawkins' house somewhere." (SOF ¶44). That hardly sounds like a "trade secret"

that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See* Fla. Stat. Ann. §688.002(4)(b). In fact, this Court has previously found that a plaintiff who leaves alleged trade secrets in the hands of others cannot claim the information at issue is a trade secret at all. *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1360 (S.D. Fla. 2012).

In a July 12, 2013 email, eVoter (through former CEO Adam Kravitz) wrote to Hawkins (who had not been an employee since April 2012) to discuss the eVoter server and the fact that no one was interested in reviving eVoter. Tellingly, eVoter stated, "I guess I will just have to trust you to keep it safe and hope that if there is ever any real interest in anyone taking it over that you will actually help out." (SOF ¶29). Hawkins responded that eVoter ***could have the server back***, adding only that Hawkins could not pay for moving it. (*Id.*). Hawkins stated, "If you want it back online, lets (sic) do it. I'll put it up wherever you want it. Perhaps a server at Amazon?" (*Id.*). eVoter also testified that Hawkins took the server when he moved out of South Florida because "he was the only one who could access it. It only meant something to Andy." (SOF ¶45; *see also* SOF 47 (eVoter admits it does not know what Hawkins has done with the server)). eVoter also explained, "Even if Andy turned around and said, here's [] the server with the [] website on it, I need Andy to develop it to make it work." (SOF ¶46).

eVoter admits it has not sued Hawkins or made any other effort to regain the server. (SOF ¶48). eVoter also admits that Hawkins never worked for ES&S. (SOF ¶49). eVoter's emails admit that the only thing stopping eVoter from using the computer code is eVoter, and the lack of "any real interest" in eVoter. (SOF ¶29). As such, eVoter has no evidence that ES&S or Riddell misappropriated anything, because it admits Hawkins was the only one in position to do so, and neither Hawkins, Riddell, nor ES&S, has done anything with the server, the code, or anything else from eVoter.

4.     **With no trade secrets, eVoter's claims for injunctive relief also fail.**

Counts III and IV of the Complaint request injunctive relief on the claimed basis that §

688.003 of the FUTSA affords eVoter relief to protect its alleged trade secrets. (DE 1-2, ¶¶44,

55). Because there are no trade secrets at issue in this case, which is a fundamental element of a

claim seeking injunctive relief to protect a trade secret, the requests for injunctive relief in

Counts III and IV are also ripe for summary judgment in favor of Riddell and ES&S. *See, e.g.,*

*supra. See also Mittenzwei v. Indus. Waste Serv., Inc.*, 618 So. 2d 328, 329 (Fla. Dist. Ct. App.

1993) (no injunction where evidence failed to establish the existence of a trade secret);

*Templeton v. Creative Loafing Tampa, Inc.,* 552 So. 2d 288, 290 (Fla. Dist. Ct. App. 1989)

(reversing entry of injunction where there was no evidentiary basis to show there was a trade

secret at issue); *Keel v. Quality Med. Sys., Inc.*, 515 So. 2d 337, 338 (Fla. Dist. Ct. App. 1987)

(no injunction where "the evidence adduced at the injunction hearing simply does not

demonstrate, as it must, that the customer information was confidential or was a business or trade

secret").

Count IV against ES&S also refers to injunctive relief under Fla. Stat. Ann. § 542.335 to

"enjoin the actions of ES&S." (Doc 1-2, ¶50). Based on their research, ES&S and Riddell are

unaware of any holding of any court in Florida that permits injunctive relief against a third party,

such as ES&S in this instance. *See Bauer v. DILIB, Inc.*, 16 So. 3d 318, 320-21 (Fla. App. 4 Dist.

2009) ("However, at no time has this court or any other court held that the power to enjoin third

parties derives from section 542.335 or its predecessor, section 542.33"). Indeed, this Court has

noted that while a limited exception may exist to allow the Court to enjoin non-parties to a non-

compete agreement, the party seeking an injunction must prove the nonparty is "either under the

signator's control or otherwise being used to aid or abet the signator in violating the non-

compete clause." *See Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1221 (S.D. Fla. 2014).

Count VI also appears to request mandatory injunctive relief either restraining ES&S "from continuing to interfere with" eVoter's "relationship" with Riddell, or, "restoring Riddell" to his role with eVoter. *See* (DE 1-2, p. 18). ES&S and Riddell are unaware of any legal authority or equitable maxim that would permit the Court to enter an injunction requiring Riddell to be "restored to his [Chief Product Officer]" role at eVoter, which is a defunct, non-operating company with no income and no money. Further, the request constitutes a judicial admission that Riddell does not and has had no employment relationship with eVoter for quite some time; indeed, since April 2012.

### B.     eVoter Cannot Enforce a Contract it Failed to Perform

Riddell disputes any claim that he breached any contractual duty he allegedly owed to eVoter. eVoter stopped paying contractual wages to Riddell in April 2012. (SOF ¶¶4, 10). eVoter ceased operations about the same time. It eventually shut down its website completely in August 2012. (SOF ¶¶10, 21). Kravitz stated to an eVoter customer on April 19, 2012, "the fact is that we are pretty much out of money and are winding down rather than get into commitments where I can't deliver…[o]bviously I am very depressed about this, but the fact is that we could not get either the capital funding we needed or the big $ clients fast enough." (SOF ¶12; s*ee also* eVoter Deposition Exhibits ("Depo. Exs.") 8-17 (cessation and winding up of eVoter operations in April 2012); Depo. Ex. 5 (acknowledging on April 26, 2012 that eVoter would not be participating in a state Republican convention as it had previously); Depo. Exs. 24-36 (discussing in May–August 2012 further details of ceasing eVoter operations). Yet despite these undisputed circumstances, eVoter claims Riddell continued to be contractually obligated to eVoter in May 2013, more than

a year later, and, unbelievably, also claims he still is today. eVoter's arguments fail as a matter of law.

Counts I and II of the complaint allege breach of contract against Riddell based on the "Executive Employment Agreement" attached to the Complaint. More specifically, Count I alleges a breach of the covenant not to compete (DE 1-2 at ¶¶12, 23-29), and Count II alleges a breach of a confidentiality provision (DE 1-2 at ¶12, 30-34). In each case, eVoter claims that "[s]ince there has been no termination of the Employment Agreement by either RIDDELL or EVOTER, Defendant RIDDELL was, and still is, subject to the described terms and provisions of the employment contract." (DE 1-2 at ¶28). However, eVoter cannot as a matter of law enforce a contract against Riddell in 2013 (or today) when eVoter stopped performing under the alleged contract in 2012.

It is a black-letter rule of contract law that a prior material breach by party seeking to enforce a contract entitles the opposing party to terminate his own performance and treat the contract as breached. *See Arquette Development Corp. v. Hodges*, 934 So. 2d 556, 559 (Fla. Dist. Ct. App. 2006); *Hospital Mortg. Group v. First Prudential Development Corp.*, 411 So. 2d 181, 182 (Fla. 1982) ("Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance. . . . [T]he nonbreaching party is relieved of its duty to tender performance and has an immediate cause of action against the breaching party"); *see also Cintas Corp. No. 2 v. Schwalier*, 901 So. 2d 307, 309 (Fla. Dist. Ct. App. 2005) ("Here, the consideration for the contract was the promise of continued employment, increased pay and benefits. Cintas' failure to keep this promise may support an action by Schwalier for breach of contract or a defense to a claim that Schwalier had himself breached the contract.").

Section 4.1 of the Employment Agreement required eVoter to pay Riddell no less than $120,000 per year in salary, with the potential for additional bonuses and awards. (SOF ¶3). Yet eVoter admits that it stopped paying Riddell in April 2012; that it has not paid Riddell any amount since that time; and that it ceased operations and shut down its website shortly after that time. (SOF ¶¶4, 10, 21). Both of eVoter's breach of contract claims fail as a matter of law because eVoter admits that it did not live up to its end of the bargain. By failing to pay Riddell salary (or benefits under § 4.4 of the Employment Agreement), and by ceasing operations, eVoter breached the Employment Agreement and therefore is barred for attempting to enforce its provisions against Riddell now.

In *Dialogo, LLC v. Bauza*, 456 F. Supp. 2d 219 (D. Mass. 2006), the court was faced with an identical situation as here, in that a former employer sought to enforce a confidentiality and covenant-not-to-compete provision under an employment agreement for which the employer had failed to pay the salary due under the contract. In granting summary judgment for the employee, *Dialogo* held that failure to pay the employee contracted wages barred an employer from enforcing against the employee the confidentiality and non-compete provisions of the contract. *Id.* at 225.

eVoter's claims fail for exactly the same reasons as the employer's claims in *Dialogo*. eVoter's failure to pay Riddell wages beginning in April 2012 relieved Riddell from having to abide by his end of the bargain. *Beefy Trail, Inc. v. Beefy King Intern., Inc.*, 267 So. 2d 853 (Fla. Dist. Ct. App. 1977) ("[t]o constitute a vital or material breach a [party's] nonperformance must be such as to go to the essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part."). *See also MDS (Canada) Inc. v. Rad Source Technologies, Inc.*, 720 F.3d 833, 849 (11th Cir. 2013) (quoting *Beefy Trail, supra*).

There can be no dispute that Riddell's wages and benefits, as well as continued operation of the company, were material terms of his employment agreement with eVoter. Thus eVoter cannot, more than one year after it stopped paying Riddell his salary, claim that Riddell still works for eVoter and owes it all of the duties under a contract that eVoter itself has failed to perform.

It is also important to note that when eVoter stopped paying Riddell in April 2012, it understood that he went on to secure other employment that was not ES&S. (SOF ¶¶4, 17, 18). ES&S did not engage Riddell as an independent contractor until May 2013, which is <u>more than one year</u> after Riddell left eVoter by virtue of it no longer being able to pay him wages under the contract. (*See* DE 1-2, Ex. A at ¶6 (Riddell's contract had 12-month covenant-not-to-compete)). eVoter attempts to avoid this fatal, undisputed fact by claiming that Riddell never quit and eVoter never terminated him, so therefore he continues to work for eVoter even today. (DE 1-2 at ¶28). This position ignores eVoter's own breach of the Employment Agreement by failing to pay promised wages and benefits. It also ignores the fact that eVoter informed Riddell and others beginning in April 2012 that the company was out of money and ceasing operations. (SOF ¶¶10-14).

Furthermore, eVoter's confidentiality claim against Riddell based on the contract fails for the same reason: there is no enforceable contract. It also fails because eVoter does not and cannot point to any specific confidential information that Riddell allegedly shared with ES&S. (*See* Section III. A, *supra*). As the complaint shows, eVoter bases its breach of the confidentiality provision on its "trade secrets" (*see* DE 1-2 at ¶¶9, 30-34) which as discussed above fails for several reasons.

### C.   eVoter Had No Contracts or Expectations With Which ES&S Could Interfere

eVoter's tortious interference claim (Count VI of the Complaint) also fails as a matter of

law because there was no interference, and there were no contracts with which ES&S could interfere in the first place. Notably, eVoter's interference claims are based solely on the assertion that ES&S interfered with eVoter's employment agreements with Riddell and Hawkins (Ex. A 251:4-18)—not with any customers, vendors or other third parties—just Riddell and Hawkins.

Under Florida law, a claim for interference with contract requires eVoter to show: (1) the existence of a business relationship under which eVoter has rights; (2) ES&S' knowledge of the relationship; (3) an intentional and unjustified interference with the relationship; (4) by ES&S; and (5) damages to eVoter caused by the interference. *See Greenberg v. Mount Sinai Medical Center of Greater Miami, Inc.*, 629 So. 2d 252, 255 (Fla. Dist. Ct. App. 1993). While ES&S and Riddell do not concede any of these elements, eVoter's claim fails as a matter of law if it fails to prove even a single element. For the purposes of summary judgment, it is clear that on the undisputed facts, eVoter's tortious interference claim fails as a matter of law because eVoter cannot show elements (1), (3), or (5).

First, as discussed above, there was no enforceable contract between Riddell and eVoter because eVoter stopped paying its employees in April 2012 and ceased operations shortly thereafter. Accordingly, ES&S could not interfere with a contract that did not exist. *In re Maxxim Medical Group, Inc.*, 434 B.R. 660, 689 (Bk. M.D. Fla. 2010) (quoting *Ferguson Transp., Inc. v. North American Van Lines, Inc.*, 687 So. 2d 821 (Fla. 1996) for proposition that "action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."). eVoter stopped paying employees in April 2012 and ceased operations shortly thereafter, and therefore it had no contract rights with respect to Riddell when he met with ES&S in January 2013 or when Riddell started working as an

independent contractor with ES&S in May 2013. (SOF ¶¶23-26). eVoter cannot claim interference with its relationship with Riddell by "preventing Riddell from further performing his duties and fulfilling his covenants with eVoter," (DE 1-2 at ¶¶69, 72), when Riddell's employment with eVoter had long since ended.

Second, there is no "intentional and unjustified interference" by ES&S simply by engaging Riddell as an independent contractor more than one year after eVoter stopped paying him and he had already moved on to other employment after eVoter ceased operations. *See Martin Petroleum Corp. v. Amerada Hess Corp.*, 769 So.2d 1105, 1107 (Fla. Dist. Ct. App. 2000); *Fiberglass Coatings, Inc. v. Interstate Chemical, Inc.*, 16 So.3d 836, 838-39 (Fla. Dist. Ct. App. 2009).

Third, eVoter has no damages, which is discussed in detail in section III. D, *infra*. Specific to the tortious interference claim, however, in *KMS Restaurant Corp. v. Wendy's Intern. Inc.*, 194 Fed. App'x 591 (11th Cir. 2006), the court discussed the proper measure of damages for alleged tortious interference, and it explained that well-established Florida law stated:

> if a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss.  If the business is not completely destroyed, then it may recover lost profits.  A business may not recover both lost profits and the market value of the business.

*KMS*, 194 Fed. App'x at 601 (quoting *Montage Group, Ltd v. Athle-Tech Computer Sys., Inc.*, 889 So. 2d 180, 193 (Fla. Dist. Ct. App. 2004)).

Here, eVoter closed due to a lack of funding/income long before ES&S met with Riddell in January 2013 and even longer before ES&S engaged Riddell as an independent contractor in May 2013. Accordingly, there could be no act by ES&S in the alleged interference that "completely destroyed" eVoter. (*See* SOF ¶¶53-54 (eVoter claims damages for tortious interference as $3.2 million, based on alleged $2.6 million valuation and purported $600,000 in

sweat equity)). It was eVoter's own failed business model that caused its demise. (*See, e.g.*, Depo. Ex. 14 (Kravitz explaining reason for eVoter ceasing operations: "fact is that we could not get either the capital funding we needed or the big $ clients fast enough."). Accordingly, market value of the business is the wrong measure of damage in this case. And because eVoter had no customers, no income, and no profits (SOF ¶¶50-52)—which is why it was forced to close in 2012—there could be no evidence to support a claim for damages for anything ES&S and Riddell did or could be alleged to have done in 2013.

**D.      eVoter Has Not Suffered Damages Under Any Claim for Relief**

In addition to its failure to produce evidence that would establish misappropriation of a trade secret, breach of contract, or tortious interference by ES&S or Riddell, eVoter has also failed to produce evidence that it has suffered damages for any of the six counts in its Complaint. In fact, eVoter cannot establish it has suffered any damages at all.

Damages are an essential element of each of eVoter's claims for relief, and eVoter bears the ultimate burden of proof on that issue. *See Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1336 (S.D. Fla. 2006) (holding FUTSA requires plaintiff seeking damages to prove either actual loss caused by misappropriation, unjust enrichment, or a reasonable royalty); *see also JMA, Inc. v. Biotronik, Inc.*, No. 12-23466-CIV, 2014 WL 4906398, *11 (S.D. Fla. Sept. 30, 2014) ("Proof of damages is an essential element of tortious interference, and breach of contract." (internal citations omitted)). Upon a showing by ES&S and Riddell that there is a glaring absence of evidence in the record on the issue of damages, the burden of production shifts to eVoter, which must come forward with evidence that establishes a genuine issue of material fact for trial as to its damages. *Lage v. Ocwen Loan Servicing LLC*, No. 14-CV-81522, 2015 WL 7294854, *4 (S.D. Fla. Nov. 19, 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). When there is a clear absence of evidence on this essential element of a

plaintiff's claim, summary judgment "is undoubtedly proper." *Id.* at \*16 n.19 (citing *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008)).

In its deposition, eVoter describes a damages theory that depends entirely on the existence of development costs that ES&S allegedly avoided—and not on any actual losses suffered by eVoter. For example, eVoter claims that by working with Riddell, ES&S gained access to certain "know-how" and "lessons learned," which eVoter arbitrarily values at $2.5 million. *See* (Ex. A 158:14-19 ("The know-how that we developed that cost us two and a half million dollars to develop, I believe [Riddell] disclosed that, or enough of that to ES&S so that, that that benefited them materially, that they would not have to, you know, spend that kind of money to learn those lessons.")). However, eVoter does not allege that it earned $2.5 million in profits prior to the alleged misappropriation, breaches of contract, and tortious interference of which it complains, or that it lost future profits as a result of the defendants' alleged conduct or otherwise supports its arbitrary "know-how" claim of $2.5 million. *See Alphamed Pharm. Corp.*, 432 F. Supp. 2d at 1339 (holding plaintiffs must show "an actual loss, unjust enrichment, or a reasonable royalty" to recover damages under the FUSTA). eVoter also does not argue that a reasonable royalty for its alleged "know-how," "lessons learned," and "mistakes that were made," (SOF ¶34), would be equal to the $2.5 million eVoter spent trying to develop its product. Instead, eVoter's claim for damages is based entirely on the conjecture that ES&S received an unjust benefit because ES&S, as a result of its brief affiliation with Riddell, may have spent less of its own money on its Informed Voter project—a separate pilot project that ES&S explored on its own, and then ultimately abandoned—than it otherwise would have spent on the project.

Accordingly, ES&S and Riddell are entitled to judgment as a matter of law on all counts of eVoter's Complaint.

Dated this 11th day of December, 2015.

ELECTION SYSTEMS & SOFTWARE, LLC
and MICHAEL RIDDELL, Defendants,


By:  *s/ L. Louis Mrachek*
    L. Louis Mrachek, Florida Bar No 182880
    MRACHEK, FITZGERALD, ROSE,
    KONOPKA, THOMAS & WEISS, P.A.
    505 South Flagler Drive, Suite 600
    West Palm Beach, FL  33401
    (561) 655-2250
    (561) 655-5537 (facsimile)
    lmrachek@mrachek-law.com

and

    Michael C. Cox, *(admitted Pro Hac Vice.)*
    Daniel J. Fischer, *(admitted Pro Hac Vice)*
    David A. Yudelson, *(admitted Pro Hac Vice)*
    KOLEY JESSEN P.C., L.L.O.
    1125 South 103rd Street Suite 800
    Omaha, NE  68124-1079
    (402) 390 9500; (402) 390 9005 (facsimile)
    Dan.Fischer@koleyjessen.com
    Mike.Cox@koleyjessen.com
    David.Yudelson@koleyjessen.com

Attorneys for Defendants.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 11th day of December 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which sent notification of such filing to the following:

    Wayne M. Alder, Esq.
    Becker & Poliakoff, P.A.
    Bank of America Centre
    625 North Flagler Drive, 7th Floor
    West Palm Beach, FL  33401
    walder@bplegal.com

                    *s/ L. Louis Mrachek*
                    L. Louis Mracheck